If it please the Court, good morning, Your Honors. I'm Gretchen Fusilier, the attorney representing Ray Kee, Rashawn Sanders. I would like to begin initially with the argument relating to the use and carriage of a firearm during the robbery of the bank. As this Court is aware, this case arose out of a bank robbery which occurred in 2001. And at that time, Mr. Sanders, with Mr. Walker, Hamilton and Hopkins, went to a bank in Manhattan Beach. On September 17, they went to the site of where the bank was with the vehicles that they intended to use in the bank robbery, a van and a U-Haul, which would be the so-called getaway vehicle. Because they saw police officers in the parking lot that particular day, there was apparently the bank robbery was aborted. There was no bank robbery. They returned the following day. On the following day, Walker and Hopkins went into the bank. And Hopkins, let me backtrack just a little bit. On the day before, when they were in transit and arrived at the bank, Walker had, unbeknownst to Sanders, brought a gun. And when he showed it to Hopkins and they mentioned it to Sanders, Sanders unequivocally indicated, no, we don't, you don't need a gun. You're going to have a note. So at that point, apparently, when Walker said something, I believe that Sanders said something to the evidence or testimony that Sanders at any time had planned with anyone else for the use of the gun during and in the course and scope of the bank robbery. The government seems to believe that there is the foreseeability prong that vicariously, under the conspiracy, holds Sanders liable for the 924 as well as Walker and Hopkins. We dispute that. We have indicated under the Castaneda case that there is no presumption of foreseeability. And furthermore, there must be some evidence that Mr. Sanders had knowledge of the use of the gun. On the day of the robbery, there was no mention of the gun. There was no display of the gun. And the government believes that because the day before there was reference and visibility of the gun was visible, that that carries over to the following day, and we dispute that. The government further believes, based on its argument relying on Garcia and Johnson, which were major drug cases in a crack house case, where the appellate court indicated that there is a nexus between major drugs, crack houses, and the use of a gun. However, there was, in the Castaneda case, no indication that that presumption relating to a nexus between drugs and a gun carries over to a presumption between other crimes and the use of a gun. And the rationale definitely was that with a crack house, people are coming who are unstable, dangerous, and one would obviously know that a gun would be there for use. In this particular situation, although the government has characterized Mr. Sanders as a principal organizer, at the sentencing, the sentencing judge clearly and unequivocally indicated when the government made a similar argument. We're not talking about presumptions here. In this case, what you're battling is the fact that there's actual testimony that they agreed in advance to the use of the firearm, that Hopkins testifies to that. And Sanders, although at first he said, you know, we don't need a gun, all we need is a note, he then said after, sometime later, he said, that's cool too. I guess if you want to use a gun, use the gun. That's the evidence we have to deal with here. Your Honor, I understand that. And that was the day before. There was no explanation, there was no elaboration as to what he meant, use of the gun. He, as far as Sanders is concerned, he may have believed that use of a gun was merely taking the gun in on Sanders' person without displaying it once inside the bank. However, that is the gist of our rebuttal, that we don't believe that there was sufficient knowledge to find Sanders liable under conspiratorial theory, because we don't believe that the use of the gun on the 18th by Walker was within the scope of the conspiracy as required as one of the charges of Pinkerton, nor was there a reasonable foreseeability that he would pull it out and use it in the bank. I would also like to address the argument relating to physical restraint, which we have argued as a sentencing error. At the time of sentence, the sentencing court increased or enhanced the sentence by two, the offense level by two levels, because it found that there had been a physical restraint. And we are relying on the cases of Parker and Anglin, in which the definition in Anglin, not necessarily definition, but an explanation that physical restraint usually requires something more than what happened in this case. It indicates someone perhaps being bound, someone being locked in a room, someone being transported some meaningful distance. And in this particular case, we don't believe that taking Ada Garcia, one of the tellers, to the vault by the person who did not have the gun in the bank, falls under the physical restraint elements as the precedent cases have, in our opinion, established. Moreover, I would like to bring it to the Court's attention that on December the 1st, we bring a motion, because in our reply brief, I had not raised the Blakely and, of course, at that time, Booker and Fanfan had not been decided, requesting leave to file supplemental arguments regarding the Fifth and Sixth Amendment implications of Blakely and now, of course, Booker and Fanfan. On January the 21st, there was a directive that was issued by the Court, well, by Kathy Catherson, by direction of the Court, indicating that no motions, Rule 28J letters or anything relating to further supplemental pleadings or briefing relating to the Booker-Fanfan decision would be appropriate unless specifically requested by the Court. However, inasmuch as the physical restraint enhancement, as well as the obstruction of justice, which the sentencing court also enhanced, Mr. Sanders, for at the time of sentencing, the obstruction of justice enhancement was actually based on the conviction of the count of witness tampering or attempted witness tampering. And those were not neither admitted to by Mr. Sanders nor found true by a jury. So we do believe that the Fifth and Sixth Amendments under the recent Booker-Fanfan decisions are implicated in that, although we have not briefed it in light of the Court's directive and, I guess, nonresponse to my mention. But we have the motion under advising that whether to accept it even or whether to, you know, acting on it. So we'll consider that in connection with the disposition. Thank you very much, Your Honor. I would just briefly like to say also, relating to the attempted witness tampering conviction charge, the government argues that, you know, there is no evidence that there was no shared Fifth Amendment privilege between Mr. Sanders and Mr. Hopkins. And we believe that the cases that we have cited reflect and demonstrate clearly that where you are speaking of co-conspirators, one co-conspirator such as Mr. Sanders in this case, advisement, persuasion, encouragement of another co-conspirator to invoke his Fifth Amendment right can be affected in more than one way. And in one of the cases, it indicates that if one co-conspirator knows that the second one, implication of the first one, would obviously incriminate the cooperating co-conspirator. And in this case, it would mean that Sanders would know that if Hopkins implicated Sanders in the bank robbery, he essentially is giving up his own Hopkins Fifth Amendment rights and that Sanders shared this Fifth Amendment right and had and needed to do more than that in order to be criminally responsible for attempted witness tampering. The people indicate that Mr. Sanders went beyond that, that he attempted to induce Mr. Hopkins to lie and refers to the declaration that was provided to him by an M&M and was returned. The people, the government also argues that the circumstances, the timing, the location at MDC, the relationship of the floors that Mr. Sanders was on in relationship to the floor that Mr. Hopkins was on, the totality of those circumstances indicates that the person who was authoring the kites sent through the plumbing system of MDC, as well as the person who was communicating through the vents of MDC, was in fact Mr. Sanders. And we do not believe that there was sufficient evidence to establish that. Certainly, Mr. Sanders was there at some point in time that Mr. Hopkins was there. However, we do have the testimony of Mr. Wanamaker, who was, I believe his title was head of security of the facility, who indicated on any given day there were more than a thousand inmates in the facility, and that anyone who is an inmate in that facility does not look kindly on someone who would be characterized as a snitch. There was, therefore, I think we have to have more than just the convenient time frame of Mr. Sanders and Mr. Hopkins being there together, that at one point in time Mr. Hopkins was referred to his attorney's name that Mr. Hopkins did not know up to that point. Others in the jail have a very good communication system. It could have been almost anyone communicating with Mr. Hopkins. It could have been almost anyone sending the kites to Mr. Hopkins. It could have been anyone who sent the declaration to Hopkins. We do have the education supervisor who administered the law library, and she indicated that not only was Mr. Sanders in the law library with access to a typewriter to prepare a declaration or other facilities of the library, but at least approximately 20 other people were in there, including the person who was referred to, I believe, as M&M or M.M. I'm forgetting. I think I'm getting a rap artist mixed up in this argument. But the evidence does not exclusively limit and isolate Mr. Sanders as the author. Why would somebody out of the kindness of their heart draft a declaration that we see in the record here? Your Honor, I don't think that's the case. On behalf of Mr. Sanders. Unless Mr. Sanders was interested in obtaining a declaration like that. I think that from Mr. Hopkins' testimony, he said that some people on his floor would come up to him and say, you know, I'm just concerned about you. So I don't know. You know, maybe on one hand it might be somewhat naive to think that someone else would do that on behalf of Mr. Sanders. However, of course, this is outside of the record, but sometimes I know that there have been incidences when someone is in prison and a co-defendant has said to them, or I'll pay your attorney's fees for you. Now, granted, this is not that kind of a situation, but I think it's a good question, and unfortunately, I don't have an answer for you for that question. Unless there are additional questions, I would, I guess, allow the government to respond and reserve whatever time for rebuttal. Thank you. May it please the Court. My name is Karen Meyer, and I represent the United States in this case. With respect to the first issue raised by defendant, whether or not there was sufficient evidence to convict defendant of the 924C count, I would like to direct Your Honor's attention to Excerpt of Record, page 289. Defendant argued that Sanders could not have known that this was going to be a takeover bank robbery. That Sanders all along intended for this simply to be a note job. In response to a question, did you give, did he give you any details at that time about what you were going to do? Mr. Hopkins responded. Well, he, meaning Mr. Sanders, gave small details, saying that I would be pretty much jumping over the counter or handing them a note jumping over the counter, telling them to escort me to the vault. Sanders never intended for this to be a note job. What Mr. Hopkins testified to is that he was either going to tell the teller that, to direct him to the vault, or he was going to hand the teller a note telling the teller to direct him to the vault. In either case, this was going to be a takeover bank robbery. There's other evidence that the defendant intended this to be a takeover bank robbery, which includes giving Hopkins a layout of the bank. The only reason that Hopkins would need a layout of the bank would be to know his way around to the vault and to be able to exit quickly. Defendant also talked to Hopkins about enlisting someone else to help with the robbery, and actually helped him find someone to go in the bank with him. As I mentioned, the record makes clear that Sanders intended all along for Hopkins to jump over the teller counter and take one of the tellers to the vault and get money. There's plenty of evidence then that the defendant intended this all along to be a takeover robbery where a weapon would be reasonably foreseeable. Defendant argued that the Castaneda case supports her view, I'm sorry, his view, that the weapon is not reasonably foreseeable. But at page 768 of that opinion, it actually states that the defendant is not required to have actual knowledge as to the weapons to be able to be liable under a Pinkerton theory. In this case, the defendant did have actual knowledge of the weapon, as Your Honor pointed out. The defendant, when told by Walker that he was going to use the gun, said, I don't think you need it, but that's cool, go ahead, use the gun. So defendant is, in fact, liable under Pinkerton theory of liability for the 924C count. Just briefly, Your Honor, with respect to the physical restraint argument. Defense focuses on two principal cases, Parker as well as Anglin. Your Honor, the focus of the test, and that test comes out of this circuit, is where physical restraint should apply where the robbers, quote, checked the victim's free activity. This is used in both U.S. v. Thompson and U.S. v. Flop. The Parker case, which defendant cites, actually supports this view. In that case, the defendant was liable when the co-defendant grabbed the teller by the hair and pulled her up from the floor. The defendant wasn't liable where the co-defendant forced teller to simply get down on the floor at gunpoint. But in this case, what you have is Hopkins taking the teller to the vault. You are checking that teller's free activity. And therefore, the physical restraint enhancement should apply. With respect to whether there was sufficient evidence to convict defendant of attempted witness tampering, defense argues that Sanders only encouraged Hopkins to assert his Fifth Amendment rights. But the fact is that the defendant did much more than that. The defendant urged Hopkins to recant his prior identification of the defendant as participating in the bank robbery. He told Hopkins to lie about defendant's participation in the bank robbery. That's reflected in one of the kites that's before this Court where the defendant said, he just has to say he don't know me, that I'm not the one. Defendant also encouraged Hopkins to memorialize this lie in the declaration, which, in fact, the defendant does not contest came from him. And in this declaration, encouraged Hopkins to lie under oath, perjure himself by signing the declaration that the defendant was not involved in the bank robbery. The circumstances surrounding that declaration actually support the finding that the vent communications and the kites came from the defendant. Originally, defendant told Hopkins to expect a document to arrive. After that, Hopkins received four copies of the declaration from another inmate. Hopkins actually learned that after he signed those declarations and gave them back to the inmate, that the defendant had received them because he called him through the vents and said, thanks, and that I'll put money on your books for doing that. The declaration itself was from the defendant because it actually, in the cover letter to the declaration, it had the defendant's, the name of the defendant's lawyer, which Hopkins testified he didn't know. He had never met that lawyer. He didn't know his name. He had never spoken to him. The cover letter and the declaration also both included Hopkins' registration number, which Hopkins testified he gave to defendant when they were incarcerated together at Kern County Jail. And then after that declaration was delivered, the defendant sent a further kite to Hopkins saying, can you execute another one, because our lawyers didn't do anything with them. They didn't turn them in. They acted shady. So the circumstances surrounding the declaration also support the fact that the kites, the vent communications, and the declaration came from the defendant. If Your Honors have no further questions, the government believes that the defendant's conviction and sentence should be affirmed. Thank you, counsel. Just one point in response to the government's position. The fact that Mr. Sanders might have had information that Hopkins believed was unique to Mr. Sanders does not obviate from the evidence that was presented that other inmates did not share the same information or did not have the same information that Sanders had. And I think that to, at some point, one is having to extrapolate a lot from the fact that because Mr. Sanders knew his own attorney's name and Hopkins didn't know Sanders's attorney's name, because someone told Mr. Sanders through a vent that I'll send you cigarettes, where Mr. Hopkins, excuse me, where Mr. Sanders had said that to Hopkins, where Mr. Hopkins had testified that the voice was an unidentified voice, that he had only really known Mr. Sanders for a short period of time. I do believe that there are other persons who may have been available at the same time frame and might have also been the authors, and on that I would submit it. Thank you very much. Thank you. All right. Thank you, counsel. U.S. v. Sanders is submitted. And we will take up Raycon Refractory and Construction v. NLRB.
judges: Hall, Wardlaw, Paez